NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

CRESSKILL VOLUNTEER FIRST AID SQUAD, Et al.

        Plaintiffs,

    v.

BOROUGH OF CRESSKILL, Et al.,

        Defendants.

CIVIL ACTION NO. 05-3294 (DRD)

**OPINION**

Appearances

POST, POLAK, GOODSELL, MACNEILL & STRAUCHLER, P.A.
David L. Epstein, Esq.
425 Eagle Rock Avenue - Suite 200
Roseland, New Jersey 07068-1717
    *Attorneys for Plaintiffs*

HILL WALLACK
James G. O'Donohue, Esq.
202 Carnegie Center - CN 5226
Princeton, New Jersey 08543-5226
    *Attorneys for Defendants Borough of Cresskill, Mayor Benedict Romeo, Keith Brassel, James Cleary, John McCann, Carolyn Schultz, Thomas Thomasma, and Keith Brigley*

THOMAS B. HANRAHAN & ASSOCIATES
Thomas B. Hanrahan, Esq.
80 Grand Avenue
River Edge, New Jersey 07661
    *Additional Attorneys for Defendants Borough of Cresskill, Mayor Benedict Romeo, Keith Brassel, James Cleary, John McCann, Carolyn Schultz, Thomas Thomasma, and Keith Brigley*

SCARINCI & HOLLENBECK, LLC
Robert E. Levy, Esq.
1100 Valley Brook Avenue
P.O. Box 790
Lyndhurst, New Jersey 07071-0790

*Attorneys for Defendants Arthur McLaughlin and Norman Saunders*

## *OPINION*

**DEBEVOISE, Senior District Judge**

The Plaintiffs in this action are the Cresskill Volunteer First Aid Squad, Inc. ("the Squad"), the New Jersey State First Aid Council, Inc. ("NJSFAC"), Carl Wallin, a member and former officer of the Squad, and Peter Olivieri, a member of the Board of Trustees of the Squad. The Defendants are the Borough of Cresskill and various of its officials as well as John Does 1-25. Presently before the court are Defendants' motions to dismiss Plaintiffs' complaint pursuant to Fed. R. Civ. P. 12(b)(6). These motions will be considered as summary judgement motions pursuant to Fed. R. Civ. P. 12(b) and Fed. R. Civ. P. 56 due to the extensive supporting documentation provided by all parties. For the reasons set forth below Defendants' motions are granted. Counts One, Six, Seven (to the extent it is based on claims arising under federal law), Eight, and Nine (to the extent it is based on claims arising under federal law) will be dismissed with prejudice. All other Counts (including Counts Seven and Nine to the extent they are based on State law) will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## *UNCONTESTED FACTS*

Plaintiff Cresskill First Aid Squad ("the Squad") is a non-profit corporation formed in 1982 to provide 24-hour volunteer first aid and ambulatory services to the residents of the Borough of Cresskill ("the Borough"). (Compl. Ex. A.) As of May 2005 there were

2

approximately twenty six active members listed on the Squad's roster.  (Wallin Aff. ¶ 17.)  In the early 1980's, the Borough Council adopted a series of local ordinances which designated the squad as the official first aid provider for the Borough.  (Compl. Ex. C.)  The Squad operated out of a building and utilized ambulances which were owned by the Borough.  (Wallin Aff. ¶ 14.)  The Squad received financial support in the form of voluntary municipal contributions it received from the Borough (in accordance with N.J.S.A. 40:5-2), as well as private donations.  (Wallin Aff.. ¶ 13.)  The great majority of the Squad's funding was provided by the Borough.  (Wallin Aff.. ¶ 13.)  The Borough additionally provided funds for the Length of Service Award Program ("LOSAP"), which is an incentive pension program (established pursuant to N.J.S.A. 40A:14-183) geared toward attracting and maintaining volunteers for emergency services.  (Wallin Aff. ¶ 14.)  The Borough provided funds for every qualifying year a member of the Squad had, and the member vested in the LOSAP after five qualifying years.  (Wallin Aff. ¶ 23.) As a non-profit corporation, the Squad was required to file an annual "Charitable Organization Financial Statement" with the Internal Revenue Service and the Attorney General pursuant to N.J.S.A. 45:17A-23.

In 2001, the Borough, facing litigation due to its lack of affordable housing, enacted a "Planned Unit Residential Development" (PURD).  (Nasuto Aff. ¶ 2.) A considerably large senior community ("Sunrise") was being developed as part of the PURD, which would house several hundred senior citizens in the Borough.  (Olivieri Aff. ¶ 10.)  During Sunrise's planning phase, the Squad informed the Borough Council and mayor that it did not have the manpower to provide ambulatory services to the residents of Sunrise due to the large number of senior citizens (and their presumed heightened need for emergency services) who would reside in the

development. (Olivieri Aff. ¶¶ 10-13.) The Squad and the Borough officials agreed that Sunrise would be required to provide its own services. (Compl. ¶¶ 42-47.) As a result, the Developer's Agreement of June 2001 required private onsite ambulatory service. (Nasuto Aff. ¶ 3; Olivieri Aff. ¶ 11.)

Between June 2001 and March 2005, a dispute evolved between the Borough and the Sunrise Developer regarding the onsite ambulatory service requirement. The developer threatened legal action against the Borough alleging that the onsite ambulatory service requirement was a violation of the equal protection clause because it applied to the residents of Sunrise but to no other residents of the Borough. (Nasuto Aff. Ex. 5.) In April 2005, on the advice of counsel, the Mayor and Borough Council reversed their position. (Nasuto Aff. ¶¶ 5-6.) The Borough and developer reached a settlement releasing Sunrise's onsite ambulatory service requirement. (Nasuto Aff. ¶ 6.) Members of the Squad strenuously objected to this change. (Wallin Aff. ¶ 29.)

As the debate for the Sunrise matter was still ongoing, but before the Borough rescinded the ambulatory service requirement, in August 2004 the Borough requested an audit of the Squad's finances for 2002-2003 for the first time in the Squad's history. (Lerch Aff.) This audit was performed by an independent auditing firm, Lerch, Vinci, & Huggins, LLP ("Lerch") which was retained by the Borough. (Lerch Aff. ¶ 4.) Since they did not receive a written representation letter from the Squad, Lerch was "unable to express... an opinion on the financial statements submitted by the Squad." (Lerch Aff. ¶ 6.) However, the Squad allowed Lerch to inspect its financial documents while preparing the audit and Lerch made the following findings with respect to errors, omissions, irregularities, and violations of the law during its audit of the

4

Squad:

>   (1) The audit of cash revealed that the Squad did not prepare monthly bank reconciliations;
>
>   (2) The audit of the purchasing cycle revealed that the Organization did not utilize a formal voucher/ purchase order system;
>
>   (3) The audit of the cash disbursements cycle revealed that the Squad disbursements were being made without approval of the Board of Trustees;
>
>   (4) The audit of the minutes could not be completed since there were no minutes available for meetings prior to December 2002.

(Lerch Aff. ¶ 7.)

Due to the apparent deficiencies, in April 2005, Lerch recommended that the Borough widen the scope of the original audit to encompass the Squad's expenditures from 1999-2004. (Lerch Aff. ¶ 8.) The Borough attorney requested that the Squad provide all of its financial records from 1999-2004 for the expanded audit. (Wallin Aff. ¶ 41.) The Squad did not immediately comply. (Wallin Aff. ¶ 41.) At some time in April or May 2005, members of the Borough Council had the police department enter the building used by the Squad in order to retrieve the Squad's financial records and provide them to the auditors. (Compl. Ex. E; Wallin Aff. ¶¶ 42-43; Romeo Aff. ¶ 17; Nasuto Aff. ¶ 8.) After realizing that the keys no longer worked, they called the locksmith, entered the building, and seized the records. At some point thereafter, the Borough had the locks changed unbeknownst to the Squad. (Nasuto Aff. ¶ 8.) The Borough additionally ordered that the Squad provide it with the Patient Care Reports ("PCPs") from the years encompassing the audit. (Wallin Aff. ¶ 47.) The Squad complied with

this request.  (Wallin ¶ 47.)  Lerch completed the expanded audit upon receiving the additional documentation, citing the following additional irregularities:

>    (1) Lack of supporting documentation;
>
>    (2) Squad funds being disbursed for unrelated purposes (including $1,450 for wedding gifts, $3,926 for the Captains Dinner, and $2,530 for Costco Memberships for all members and their spouses);
>
>    (3) Failure to sign the representation letter;
>
>    (4) Individuals receiving clothing allowance who did not meet the criteria;
>
>    (5) Failure to provide the necessary documentation to receive LOSAP benefits.

(Lerch Aff. ¶¶ 13, 20)

At a Borough Council meeting on June 1, 2005, the Council and Mayor agreed to lock the Squad out of the Borough owned building it was using.  (Wallin Aff. ¶¶ 51-52.)  The Borough also passed a resolution and enacted Ordinance 05-09-1296 which rescinded the ordinance establishing the Squad as the official provider of first aid and ambulatory services for the Borough.  (Wallin Aff. ¶¶ 51-52; Compl. Ex. E.)  The resolution stated that the Squad had: engaged in financially irresponsible action with regards to public donations, taken actions to turn away volunteers, obstructed a department audit, created difficulty in responding to emergency calls, caused a reduction in membership, and otherwise operated in a manner which adversely impacts the public safety of Cresskill residents.  (Compl. Ex. E.)  The resolution and Ordinance effectively terminated the Squad as the first aid/ ambulatory service provider for the Borough.

On June 9, 2005, the Cresskill Volunteer Ambulance & Emergency Services Company ("CVAESC") was incorporated and became the new first aid/ ambulatory service provider for the

Borough. (Compl. Ex. F.) The Mayor and several members of the Borough Council were named as Trustees in the CVAESC. (Compl. Ex. F.)

The contested facts in this case concern the underlying reasons for the audit and subsequent disbandment of the Squad. Plaintiffs claim they were subject to retribution by the Mayor and Borough Council because members of the Squad publicly opposed them in regards to the Sunrise matter. (Compl. ¶¶ 48-52.) Plaintiffs allege that since that time (which according to Plaintiff Wallin's Affidavit at ¶ 31, occurred in 2002), defendants have embarked on a "smear campaign" against the Squad and its members by deliberately discrediting the Squad and pursuing a "vendetta" against them for publicly disagreeing with defendants about the Council's decision to release the developer from its onsite ambulatory service requirement. (Compl. ¶ 49.) Plaintiffs also allege that the "smear campaign" was motivated by the Mayor's desire to defame those members of the Squad whom he viewed as potential political opponents. (Olivieri Aff. ¶ 20.)

Plaintiffs concede that they did commit the expenditures cited to as "fiscally irresponsible" in the June 1, 2005 council resolution. However, Plaintiffs contend that these types of expenditures are common practice throughout the New Jersey volunteer first aid community as a means of recruiting and retaining volunteers who devote a substantial amount of their free time to providing EMS services. (Compl. ¶ 84.)

Plaintiffs have brought action against the group of defendants which include: the Borough, the Mayor, members of the Borough Council, the Deputy Police Chief and a Detective,

individually and in their official capacity.[1] Plaintiffs claim that the disbandment of the Squad and removal of members of the Squad for the reasons cited above constitute a violation of their First Amendment right to free speech and association, and Fourteenth Amendment right to procedural and substantive due process (Count One). Additionally, Plaintiffs claim that the search of the building and seizure of the Squad's financial documents was a violation of the Fourth Amendment protection against unreasonable search and seizure (Count One). The complaint advances Plaintiffs' legal claims in nine Counts. Count One, as previously noted, asserts claims brought pursuant to 42 U.S.C. § 1983. Count Two, charges violations of the New Jersey Highway Safety Act, N.J.S.A. 27:5F-1, et seq. Count Three is for defamation. Count Four is for conversion. Count Five charges negligent supervision, training, and retention. Count Six alleges that the Borough is liable under § 1983 for the violation of federal rights. Count Seven asserts that all claims against the named defendants are also claimed against unidentified defendants John Does 1-25. Count Eight alleges that in adopting the June 1, 2005 Resolution and the June 15, 2005 Ordinance, the Defendants acted arbitrarily, capriciously, and unreasonably. In Count Nine, Plaintiff NJSFAC purports to appear on behalf of several hundred first aid squads in the State of New Jersey which are similarly situated to the Squad and alleges that if the Defendants' actions were permitted to stand all those squads would be adversely affected.

      Plaintiffs have sought relief in the form of: (1) a preliminary and final injunction

---

[1] Plaintiffs subsequently notified the court that they have dropped their actions against the following city council members in their individual capacities: Keith Brassel, James Cleary, Carolyn Schultz, Thomas Thomasma, and Keith Brigley. Actions remain against Mayor Romeo, Councilperson McCann, Deputy Police Chief McLaughlin, and Detective Sergeant Saunders.

reversing the mayor and borough council's legislation and reinstating the Squad as the official provider of first aid and ambulatory services to the Borough (The court denied Plaintiffs' motion for a preliminary injunction in its bench opinion issued October 24, 2005); (2) the return of all assets and contributions to the Squad; (3) the return of all financial files and PCPs to the Squad; (4) copies of the audit provided to Plaintiffs; (5) cessation of all defamatory speech and activity against Plaintiffs; (6) reversal of all adverse effects to the funds contained in Plaintiffs' LOSAP accounts so those accounts can be returned to where they would be had the Borough not taken any of the aforementioned actions; (7) compensatory, consequential , special and punitive damages, and such other relief as the court deems equitable and just.

Defendants, via several motions, have moved this court to dismiss Plaintiffs' complaint pursuant to Fed. R. Civ. P. 12(b)(6).  As previously stated, the court will consider these as motions for summary judgement pursuant to Fed. R. Civ. P. 12(b) and 56.

## *DISCUSSION*

I.  Standard for Summary Judgement

Summary Judgment is appropriate when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant

of summary judgment. Id. In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the nonmoving party by extending any reasonable favorable inference to that party; in other words, "[T]he nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." Hunt v. Cromartie, 526 U.S. 541, 552 (1999), quoting, Anderson, 477 U.S. at 255. But where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing' - that is, pointing out to the District court - that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (U.S. 1986).

II.     Legislative Immunity

Defendants assert that legislative immunity bars lawsuits against the defendants mayor and councilpersons because the resolution of June 1, 2005 and Ordinance No. 05-09-1296 (which repealed Cresskill Ordinance No. 84-11-877) constitute legislative action. Defendants argue that this legislative action shields those defendants from lawsuits under § 1983 for violations of constitutional rights due to its enactment. Attorneys for Plaintiffs counter that the ordinance in question was in effect an executive action, cloaked under the shield of legislation. However, that exception to the defense of legislative immunity does not apply given the facts of this case.

"The principle that legislators are absolutely immune from liability for their legislative activities has long been recognized in Anglo-American law. This privilege 'has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries' and was 'taken as a matter of course' by those who severed the Colonies from the Crown and founded our Nation." Bogan

of summary judgment. Id. In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the nonmoving party by extending any reasonable favorable inference to that party; in other words, "[T]he nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." Hunt v. Cromartie, 526 U.S. 541, 552 (1999), quoting, Anderson, 477 U.S. at 255. But where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing' - that is, pointing out to the District court - that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (U.S. 1986).

II.     Legislative Immunity

Defendants assert that legislative immunity bars lawsuits against the defendants mayor and councilpersons because the resolution of June 1, 2005 and Ordinance No. 05-09-1296 (which repealed Cresskill Ordinance No. 84-11-877) constitute legislative action. Defendants argue that this legislative action shields those defendants from lawsuits under § 1983 for violations of constitutional rights due to its enactment. Attorneys for Plaintiffs counter that the ordinance in question was in effect an executive action, cloaked under the shield of legislation. However, that exception to the defense of legislative immunity does not apply given the facts of this case.

"The principle that legislators are absolutely immune from liability for their legislative activities has long been recognized in Anglo-American law. This privilege 'has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries' and was 'taken as a matter of course' by those who severed the Colonies from the Crown and founded our Nation." Bogan

v. Scott-Harris, 523 U.S. 44, 48-49 (U.S. 1998) (citing Tenney v. Brandhove, 341 U.S. 367, 372 (1951).  The rationale for according absolute immunity to federal, state, and regional legislators also applies to local legislators.  At each level of government, the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability.  Id. at 52 (Citing Spallone v. United States, 493 U.S. 265, 279 (1990) (noting, in the context of addressing local legislative action, that "any restriction on a legislator's freedom undermines the 'public good' by interfering with the rights of the people to representation in the democratic process").

In Bogan, the United States Supreme Court thoroughly examined and explained the doctrine of legislative immunity.  The Court ruled that legislative immunity applied to local and municipal legislatures, and also defined the standard to be used in determining whether an act is "legislative" in nature.  The Court ruled that state and regional legislators are entitled to absolute immunity from liability under § 1983 for their legislative activities.  Id at 49.  Although Plaintiffs in the present case argue that the underlying motives for enacting Ordinance No. 05-09-1296 (which repealed the earlier ordinance making the Squad the official provider of first aid and ambulatory services to the Borough) make this action executive in nature and not legislative, the law laid out in Bogan clearly states that in order to determine whether an act is legislative, we must examine the nature of the act, rather than the motive or intent of the official performing it. Id at 55.  The privilege of absolute immunity "would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives."  Id.  (Citing Tenney, 341 U.S., at 377).

11

In the present case, the mayor and borough council introduced legislation based upon their apparent belief that public funds and private donations were being improperly used by the Squad. The resolution dated June 1, 2005 states:

> "WHEREAS it has come to the attention of the Mayor and Council...that funds contributed by the public to the CVA Corps [the Squad] have not been used to operate the Corps or pay for equipment, but have been used inter alia, to give wedding presents to members; have non-Cresskill funded dinners; obtain COSTCO membership for members and non-members; and that other fiscally irresponsible action has been taken with public donations; and
>
> WHEREAS, upon review of the operations of the CVA Corps, the Mayor and Council have determined actions may have been taken to turn away volunteers; obstruct a Department audit; create difficulty in responding to emergency calls; cause a reduction in membership and otherwise operate in a manner that adversely impacts the public safety of Cresskill residents; and
>
> WHEREAS, the Mayor and Council have a duty to encourage fiscal responsibility and public safety and to take action where those objectives are not being furthered in the best interest of Cresskill...
>
> ...it is the intent of the Mayor and Council to repeal Cresskill Ordinance No. 84-11-877 and to suspend any action being taken thereunder..."

Although Plaintiffs dispute the Council's stated rationale, that dispute is immaterial for the purposes of this motion. Regardless of the suspected subjective intent to enact a "vendetta" against Plaintiffs for voicing opposition to the council's decision in the Sunrise matter, the enactment of the ordinance was legislative in nature and the Mayor and Council members are immune from lawsuits under § 1983 due to the passage of the ordinance. Plaintiffs' § 1983 claims for violation of their 1st Amendment rights to free speech and association, and their 14th Amendment rights to procedural and substantive due process under Count I of the complaint are

lacking in merit.

### III. Expectation of Privacy

In Count One of the Complaint, Plaintiffs allege that the Defendants' "actions in seizing the Squad's financial records without warrant or subpoena, violated the Squad's Fourth Amendment right to be free of unlawful searches and seizures." (Compl.¶ 91.) Defendants argue that this claim fails as a matter of law because the Squad did not have a reasonable expectation of privacy in the seized financial records. Defendants claim that there was no reasonable expectation of privacy because: (1) the Squad had earlier consented and provided the records relating to publicly donated funds to the Borough in 2004; (2) the Squad freely admits that the Borough exercised direct control over the Borough contribution; and (3) the Squad as a charitable organization is required to file financial disclosure statements with various third party governmental agencies which makes it impossible for it to reasonably expect privacy in regards to these documents. (Hanrahan Br. at 8-10.) Plaintiffs concede that they had no expectation of privacy in the records pertaining to the Borough contributions (Plaint's. Br. at 8-9.); however, they claim that the Squad's consent to inspect the documents relating to public donations expired after those documents were inspected in 2004. Plaintiffs do not respond to Defendants' argument that no expectation of privacy exists where Plaintiffs are required to turn over those documents to a third party.

The Fourth Amendment provides in pertinent part:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

13

> supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
>
> U.S. Const. Amend. IV.

The purpose of the Fourth Amendment is to protect people from unreasonable searches and seizures. In order to claim the protection of the Fourth Amendment Plaintiffs must show that they had a reasonable expectation of privacy in the place searched and the items seized. Rakas v. Illinois, 439 U.S. 128, 143 (1978). Determining whether an expectation of privacy is reasonable requires the application of a two-part test. The court must determine: (1) whether an individual has exhibited an actual (subjective) expectation of privacy; and (2) whether an individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable. Smith v. Maryland, 442 U.S. 735, 740 (1979) (quoting Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). It is well settled there is no legitimate expectation of privacy in information voluntarily shared with a third party. Smith v. Maryland, 442 U.S. at 743-744) ("This Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."); SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735, 742-743 (1984) (holding that an individual had no claim under the Fourth Amendment, because once he gave his financial information to a third party, he could not object if the third party conveyed that information to law enforcement authorities); United States v. Miller, 425 U.S. 435 (1976) (no legitimate expectation of privacy in the records held by a bank); Phillips v. Bailey 337 F.Supp.2d 804, 806 -807 (W.D.Va.,2004) (no reasonable expectation of privacy existed where records held by the Department of Motor Vehicles).

In the present case upon considering the totality of the circumstances, it is clear that

Plaintiffs did not have a reasonable expectation of privacy in the Borough owned building that was searched, or in the financial records that were seized by Borough officials. The building in question was owned by the Borough. It was used to store ambulances, equipment, documents, records, and other property purchased and paid for by Borough funds and private donations to the Squad. (Nasuto Aff. ¶ 8.) The Borough, as owner, had constant access to this building. In addition to the Squad's area, the building also had areas for public recreation and meetings. (Nasuto Aff. ¶ 8.) Additionally, there were at various times, many different people who had access to the entire building. In fact, by Plaintiff's own admission, keys to the building were handed out to more than sixty seven individuals, including various Borough employees, the Department of Public Works, the Police Department, and the janitor. (Wallin Supp. Aff. ¶ 8-10.) It is also clear that the Squad had no reasonable expectation of privacy in the records which were seized. The Squad previously allowed Borough auditors to view those documents in preparation of the first audit. Additionally, the Squad as a 501(3)(c) charitable organization, was required to disclose those documents to the Internal Revenue Service and New Jersey Attorney General as part of their yearly Charitable Organizational Financial Statement. The Squad had approximately $23,537.89 in publicly donated funds on deposit at the Hudson City Savings Bank in Cresskill. (Compl. ¶ 36.) Even if there was some sort of subjective expectation of privacy by members of the Squad, that expectation was unreasonable in light of the cases highlighted above. Since there was no reasonable expectation of privacy, then Plaintiffs' Fourth Amendment claim cannot survive.

IV.     <u>Other Counts</u>

15

The previously mentioned conclusions require dismissal of Count One, in which Plaintiffs' federal law claims against all Defendants are asserted. Counts Six and Eight assert essentially the same federal law claims against the Borough. They too must be dismissed for the same reasons as Count One's dismissal.

Counts Two, Three, Four, and Five assert State law causes of action. Because all federal claims upon which the Court's jurisdiction is based are being dismissed, the State law claims will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

Count Seven asserts claims against John Does 1-25. No John Doe's have been identified and therefore Count Seven must be dismissed.

In Count Nine, NJSFAC purports to advance on behalf of several hundred first aid squads in New Jersey the same claims that Plaintiffs assert. Assuming that NJSFAC has standing, its federal claims will be dismissed and its State law claims will be dismissed without prejudice.

## *CONCLUSION*

For the reasons set forth above the Defendants' motions to dismiss, which have been converted into motions for summary judgement, will be granted. Counts One, Six, Seven (to the extent it is based on claims arising under federal law), Eight, and Nine (to the extent it is based on claims arising under federal law) will be dismissed with prejudice. All other Counts (including Counts Seven and Nine to the extent they are based on State law) will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3). The Court will file an order implementing this opinion.

Dated: December 8th, 2005                    /s/ Dickinson R. Debevoise
                                                                               DICKINSON R. DEBEVOISE
                                                                                     U.S.S.D.J.